Filed 3/10/25  P. v. Mirissage CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LESLIE MIRISSAGE,<br><br>    Defendant and Appellant. | B335917<br><br>(Los Angeles County<br>Super. Ct. No. BA326414) |


APPEAL from an order of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

* * * * * *

Leslie Mirissage (defendant) filed a motion in 2023 seeking to vacate his 2008 plea of no contest to three sex offenses involving a minor, claiming that he did not understand the immigration consequences of his plea. The trial court denied his motion. We conclude there was no error and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Defendant's background*

Defendant was born in Sri Lanka in 1969. He was married in 1987, and he and his wife had a son together. The family moved to Singapore for a few years before defendant and his wife divorced. In June 1998, defendant, then age 29, immigrated to the United States on a six-month visa, leaving his ex-wife and son behind. Defendant overstayed the visa.

#### B. *Defendant's criminal conduct*[1]

In 2007, Osanga M., defendant's then 20-year-old niece, went to the police. She reported that, since moving in with defendant five years earlier in 2002, defendant had regularly laced her food or drink with drugs and, on a daily basis, raped her vaginally while she was drugged. She also reported that, when she confronted him, he demanded oral sex in exchange for giving her tuition money, and anally raped her on several

---

[1] The facts are summarized from the probation report because the transcript from the preliminary hearing was not included in the record.

occasions.

### C. *Prosecution, plea and sentencing*

#### 1. *Charges*

In February 2008, the People charged defendant with six counts of forcible oral copulation (Former Pen. Code, § 288a, subd. (c)(2))[2] and six counts of forcible rape (§ 261, subd. (a)(2)). With respect to one count of forcible rape, the People further alleged that defendant administered the victim a controlled substance. (§§ 12022.75, 667.61, subd. (e)(6).)

#### 2. *The plea*

On November 26, 2008, the prosecution extended a plea deal to defendant. Pursuant to that deal, and contingent upon a favorable probation and Static-99 report, defendant would plead no contest to three new charges—namely, (1) unlawful sexual intercourse with a minor (§ 261.5, subd. (d)), (2) oral copulation with a person under 18 years of age (former § 288a, subd.(b)(1)), and (3) child abuse likely to cause great bodily injury (§ 273a, subd. (a))[3]—and then be sentenced to five years of formal probation and be required to complete a 52-week sex offender therapy course, but not be required to serve any further jail time, and the original charges would be dismissed.

The prosecutor explained "the People's reason" for the proposed "disposition in this case," and offered several reasons: (1) "the defendant does not have any prior criminal record

---

[2] Former section 288a was renumbered as section 287 beginning January 1, 2019. (Stats. 2018, ch. 423, § 49.)

All further statutory references are to the Penal Code unless otherwise indicated.

[3] The trial court granted the prosecution's motion to amend the information to add these charges prior to trial.

whatsoever"; (2) "there is a cultural issue" "in this case"; (3) there was only one Sinhalese interpreter (the language spoken by defendant) "available for the whole State of California," which meant securing a second such interpreter necessary for prosecution would entail "excessive cost"; (4) defendant had "been in custody for an extended period of time"; (5) the victim's "cooperation in terms of how this case [was] being resolved"; and (6) the "likelihood" defendant would "follow the terms and conditions of probation" and "attend" "therapy."

After the People moved to amend the information to add the three new counts, the court proceeded to take defendant's plea. During the plea colloquy, the prosecutor informed defendant that "[b]efore the Court can accept your plea here today, you must also be informed of the consequences of your plea." Defendant indicated that he understood. Thereafter, the following exchange occurred:

[Prosecutor:] "If you are not a citizen of the United States, your plea here today *will* cause you to be deported, denied re-entry, denied naturalization and denied amnesty. Do you understand that?"

[Defendant:] "Yes."

(Italics added.) Defendant thereafter entered a no contest plea to the three new charges.[4]

### 3. *Sentencing*

On February 25, 2009, the trial court imposed the agreed-upon sentence.

---

[4] Defendant was represented by an attorney from the Public Defender's Office, and assisted by a certified Sinhalese court interpreter.

### D. *Immigration proceedings*

In April 2013, federal immigration authorities detained defendant and initiated removal proceedings against him because he had entered the U.S. in June 1998 and overstayed his six-month visa. Defendant's applications for asylum and deferral of removal under the Convention Against Torture were unsuccessful. Defendant filed various other appeals for relief before the immigration courts. In December 2018, the United States Court of Appeals for the Ninth Circuit denied defendant's petition for review of the Board of Immigration Appeals, and that order became final on February 11, 2019.

In the midst of these immigration proceedings, defendant in 2013 filed a motion to have his convictions dismissed under section 1203.4; that motion was granted in 2014. Defendant filed a motion in 2014 to vacate his conviction due to an alleged failure to give the immigration advisement required by section 1016.5; that motion was denied. Defendant also filed an application in 2016 for a Certificate of Rehabilitation and Pardon under section 4852. That application was also denied.

## II. Procedural Background

On March 14, 2023, defendant filed a motion to vacate his 2008 plea and convictions under section 1473.7, arguing that his counsel did not "advise him of possible immigration consequences." In an accompanying declaration, defendant stated that, at the time of his plea, he had no knowledge of potential adverse immigration consequences of his plea and that, had he known, he would not have pled and would have "insisted on proceeding to trial." Defendant's motion was also accompanied by a declaration from his immigration attorney and five character reference letters, along with several filings from

the immigration court.

After a round of briefing, and a hearing, the trial court on October 5, 2023 denied defendant's motion. The court ruled that defendant had not "met his burden" of establishing entitlement to relief under section 1473.7 because defendant's declaration "d[id] not offer compelling support for the proposition that in light of the 'totality of the circumstances' [defendant] would not have agreed to the plea agreement had he meaningfully understood the actual or potential immigration consequences of his plea." Defendant filed this timely appeal.

## DISCUSSION

Defendant contends that the trial court erred in denying his motion for relief under section 1473.7.

Among other things, section 1473.7 empowers a trial court to vacate a defendant's conviction as "legally invalid" if (1) the defendant was unable "to meaningfully understand . . . the actual or potential adverse immigration consequences of a conviction or sentence," and (2) the defendant's misunderstanding was prejudicial to his decision to enter a plea. (§ 1473.7, subd. (a)(1); *People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)[5] As

---

[5] A defendant must also satisfy three further statutory requirements to be eligible to seek relief from a "legally invalid" conviction or sentence under section 1473.7, subdivision (a)(1). First, the defendant "is no longer in criminal custody" for the challenged offense. (*Id.*, subd. (a).) Second, the defendant has "establish[ed] that the conviction or sentence being challenged . . . has the potential to cause removal." (*Id.*, subd. (e)(1); see *People v. Gregor* (2022) 82 Cal.App.5th 147, 158.) Third, the defendant must act with "reasonable diligence" in bringing the motion for relief. (§ 1473.7, subd. (b)(2).) The parties do not dispute that the first two requirements are met here, and the People forfeited

6

the moving party, the defendant bears the burden of showing the legal invalidity of his prior conviction by a preponderance of the evidence. (§ 1473.7, subd. (e)(1).) We independently review trial court rulings on motions brought pursuant to section 1473.7. (*Espinoza*, at pp. 319-320; *People v. Vivar* (2021) 11 Cal.5th 510, 527-528 (*Vivar*).) And where, as here, a trial court's factual findings are derived entirely from documents rather than live testimony, the trial court and appellate courts are in the same position and deference to even factual findings is unwarranted. (*Vivar*, at p. 528.)

## I.     Lack of Understanding

In assessing whether a defendant was unable "to meaningfully understand . . . the actual or potential adverse immigration consequences of a conviction or sentence" (the first element of a section 1473.7 motion), "'the focus . . . is on the "defendant's own error"'" "'in not understanding or knowingly accepting that a guilty plea will have certain and adverse immigration consequences.'" (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 321 (*Rodriguez*), italics omitted; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871.)

We independently conclude that defendant failed to carry his burden of proving, by a preponderance of the evidence, that he did not understand or accept the adverse immigration consequences of his plea. During the plea colloquy, defendant was advised that his plea "will cause [him] to be deported, denied re-entry, denied naturalization and denied amnesty." Defendant was then asked, "Do you understand that?" and replied, "Yes."

any objection to the timeliness of defendant's motion by not challenging it below.

7

This advisal was accurate.  As defendant's own immigration lawyer declared and as defendant's lawyers during the immigration proceedings stipulated, the three crimes to which defendant pled no contest are, on the facts of this case, crimes of "moral turpitude" within the meaning of federal immigration law, and thus render him subject to removal and ineligible for withholding of removal and for other discretionary immigration relief.  (Accord, 8 U.S.C. §§ 1227(a)(2)(A)(i) [persons convicted of "crime involving moral turpitude" committed within five years of admission and for which a sentence of one year or longer may be imposed are removable], 1182(a)(2)(A)(i) [persons convicted of a "crime involving moral turpitude" are "inadmissible"].)  Where a defendant is given accurate information regarding the immigration consequences of his plea and reaffirms that he understands, that is evidence of a contemporaneous, subjective understanding of those consequences.  (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 663-664 (*Abdelsalam*) [so holding].)  Defendant cites the *In re Hernandez* case pending before our Supreme Court, but that case held, consistent with our holding here, that relief under section 1473.7 is not warranted when the plea form accurately indicates that a "guilty or no contest plea will result" in adverse immigration consequences even if the form simultaneously also indicates that "[d]eportation is mandatory for some offenses."  (*In re Hernandez* (Sept. 8, 2023, F076752) [nonpub. opn.], review granted Dec. 20, 2023, S282186; accord, *Vivar*, *supra*, 11 Cal.5th at p. 533 [plea form stating that deportation is possible but not mandatory does not constitute understanding of mandatory consequences]; *People v. Lopez* (2021) 66 Cal.App.5th 561, 577-578 [same].)

The sole evidence to the contrary in the record is defendant's self-serving statement that, at the time of the plea, he "did not have any knowledge either specific or general of any potential adverse immigration consequences of [his] pleas" without any explanation of why his plea-contemporaneous statement that he understood those consequences should not now be credited. But this is insufficient by itself: "A defendant seeking to set aside a plea must do more than simply claim he did not understand the immigration consequences of the plea. The claim must be corroborated by evidence beyond the defendant's self-serving statements." (*Abdelsalam*, *supra*, 73 Cal.App.5th at p. 664.) A defendant's post-plea conduct can sometimes function to corroborate a defendant's claim that he did not understand the immigration consequences of his plea at the time of the plea, such as when a defendant affirmatively approaches immigration authorities or voluntarily leaves the country and subjects himself to immigration scrutiny upon his return; in these instances, the defendant's otherwise self-harming conduct only makes sense if the defendant did not contemporaneously understand the immigration consequences of his plea. (*Espinoza*, *supra*, 14 Cal.5th at p. 320 [defendant took international commercial flight, which "predictably required subjecting himself to the scrutiny of United States immigration officials"]; *People v. Alatorre* (2021) 70 Cal.App.5th 747, 769-770 [defendant applied to become a naturalized citizen]; *People v. Curiel* (2023) 92 Cal.App.5th 1160, 1177 (*Curiel*) [defendant applied for citizenship for husband and lawful residence status for self].) No similar post-plea conduct exists here. Defendant points to the fact that he continued to work at his job (rather than go into hiding), but that does not rise to the level of affirmative conduct showing a lack of

9

understanding. Defendant also points to the fact that he filed post-conviction motions to expunge and vacate his convictions once immigration proceedings were initiated against him based on those convictions, but filing those motions more likely reflects a desire to escape the immigration consequences of his pleas than a lack of appreciation of those consequences in the first place.

Defendant offers what boil down to three further arguments in support of his argument that he proved his lack of understanding of the immigration consequences of his pleas by a preponderance of the evidence.[6]

First, he argues that there is no evidence that his *attorney* explained the immigration consequences of his pleas to him, and that it is impossible to obtain any such evidence because that attorney has since died.[7] Even if we ignore that defendant could have subpoenaed the attorney's notes from the public defender's office, the absence of this evidence does not undermine our conclusion because the plea colloquy otherwise establishes the

---

[6] Defendant makes two additional arguments in passing. First, he argues that the People concede any argument that they do not accompany with legal authority. This is not an accurate statement of law. Second, he argues that it is inappropriate for appellate courts to compare the facts of one case to the facts of another. That is also not an accurate statement of the law. (*Espinoza, supra*, 14 Cal.5th at p. 322 [comparing the facts of cases].)

[7] To the extent defendant suggests the People have the burden of obtaining those records, he ignores that the defendant bears the burden of proof under section 1473.7.

defendant was correctly advised of the adverse immigration consequences of his pleas.[8]

Second, defendant argues that "general advisements" given during plea colloquies do not "place a defendant on notice of the actual . . . immigration consequences of a plea." A general advisement does not, without more, establish a defendant's understanding (particularly when that advisement is inaccurate or internally inconsistent), but it is evidence of understanding that can justify denial of a section 1473.7 motion in the absence of other evidence corroborating a defendant's self-serving denial of understanding and in the absence of an explanation as to why the defendant's prior statement that he understood the immigration consequences should no longer be accepted as true.

Third, defendant argues that, even if the trial court's admonition suffices to establish his understanding of the adverse immigration consequences of his plea, defendant still lacked an understanding of the nuances of which crimes constitute aggravated felonies or crimes of moral turpitude, and how those labels apply to the various grounds for removal, inadmissibility, and discretionary relief under federal immigration law. Section 1473.7 requires a defendant to "understand" the "actual or potential adverse immigration *consequences*" of a plea (§ 1473.7, subd. (a)(1), italics added); this language indicates that the defendant must understand the bottom-line consequences of that plea rather than the minutiae of federal immigration law leading to those consequences.

---

[8]    Consequently, whether defendant's attorney had cause to believe defendant was a noncitizen is irrelevant.

11

## II.    Prejudice

In assessing whether a defendant's misunderstanding of the immigration consequences of his plea is prejudicial, the defendant must demonstrate—again, by a preponderance of the evidence—"a 'reasonable probability that the defendant would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences.'" (*Espinoza*, *supra*, 14 Cal.5th at p. 316, quoting *Vivar*, *supra*, 11 Cal.5th at p. 529; accord, *People v. Martinez* (2013) 57 Cal.4th 555, 562.)  A reasonable probability "'"does not mean 'more likely than not,' but merely 'probability sufficient to undermine confidence in the outcome.'"'" (*Rodriguez*, *supra*, 68 Cal.App.5th at p. 324.)

A defendant's "post hoc assertions . . . about how he would have pleaded but for his [lack of understanding]" are insufficient to establish prejudice absent "objective" evidence that "corroborate[s]" those assertions.  (*Lee v. United States* (2017) 582 U.S. 357, 369 (*Lee*); *Espinoza*, *supra*, 14 Cal.5th at pp. 316, 321; *Vivar*, *supra*, 11 Cal.5th at pp. 530-531; *Curiel*, *supra*, 92 Cal.App.5th at p. 1178 ["It is not enough for the defendant simply to declare that he or she would not have accepted a plea that would result in deportation"].)  In assessing prejudice, courts are to "'consider the totality of the circumstances.'" (*Espinoza*, at p. 320, quoting *Vivar*, at p. 529.)  Those circumstances include, but are not limited to, (1) "the defendant's ties to the United States," (2) "the defendant's priorities in seeking a plea bargain," including "the importance the defendant placed on avoiding deportation," (3) "whether the defendant had reason to believe," "expect" or "hope" that "an immigration-neutral negotiated disposition was possible," (4) "the defendant's probability of obtaining a more favorable outcome if he had rejected the plea,"

and (5) "the difference between the bargained-for term [of imprisonment] and the likely term if he were convicted at trial." (*Vivar*, at p. 529; *Espinoza*, at pp. 320-321, 324.)

Even if we assume that defendant did not understand the adverse immigration consequences, we nevertheless independently conclude that the totality of the "objective evidence" does not corroborate his self-serving assertion that he would not have pleaded guilty had he known his plea would have those consequences.

First, and contrary to defendant's assertion that he had "strong ties to the United States," defendant's ties to the United States are relatively weak. Defendant came to the United States as an adult and was here for less than five years prior to committing his crimes. At the time he arrived, defendant was unmarried and had no children in the United States. Although defendant states in his declaration that his "family" "were, and still are, here in the United States," the evidence in the record belies this statement: Defendant has no caretaking duties as to anyone in the United States because he has never claimed his ex-wife or child reside in the United States, and he stated his father died in 2001, and his mother died in 2008. The only identifiable "family" who was then, or is now, in the United States appears to be the victim of his crimes. The letters of support defendant submitted—from two customers at his auto mechanic's shop and three people who knew him through his temple—do not demonstrate any significantly greater ties, and some of those letters do not address his ties at the time of his plea in 2008. Defendant relatedly argues that he has a lack of ties to Sri Lanka, yet this argument is grounded in his fears of physical harm as well as ethnic and religious strife, claims that the

13

federal court previously rejected as a basis for asylum. In short, defendant's ties to the United States are arguably less extensive than those in *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1075-1076, where a defendant's 4.5-year residence in the United States with a girlfriend and child were insufficient to show the defendant's likelihood of rejecting a plea deal.

Second, defendant offers no contemporaneous evidence regarding his priorities in seeking a plea bargain or the importance he placed on avoiding deportation.

Third, defendant had little reason to believe, expect or hope that an immigration-neutral disposition was possible. In evaluating this factor, courts look to (1) "the defendant's criminal record," (2) "the strength of the prosecution's case," (3) "the seriousness of the charges or whether the crimes involved sophistication," (4) "the district attorney's charging policies with respect to immigration consequences," and (5) "the existence of comparable offenses without immigration offenses." (*Espinoza*, *supra*, 14 Cal.5th at p. 323.) Although defendant had no criminal history, he was facing very serious charges involving the rape of a minor. Defendant offers no evidence regarding the district attorney's charging policies that would cut in his favor, but argues that there were several possible, immigration-neutral offenses to which he could have entered a plea, including (1) dissuading a witness (§ 136.1, subd. (b)(1)), (2) burglary (§§ 459, 460, subd. (a)), or (3) false imprisonment by menace or deceit (§§ 236, 237, subd. (a)). Defendant's assertion that the prosecutor "would have agreed to" and would have "almost certainly jump[ed]" at having defendant plead to these "alternative charges" is speculative, as no evidence in the record—including no evidence from the immigration lawyer who filed a declaration

14

in support of his motion—indicates such offenses were within the parties' contemplation or reasonable expectation. (Compare *Vivar*, *supra*, 11 Cal.5th at p. 531 [prosecutor had already offered plea to burglary, and a plea to the same offense with a lower sentence would have no immigration consequences]; *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 305-306, 326 [prosecutor had already offered plea to two drug offenses, and a plea to one of them would have no immigration consequences]; *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 908-909 [prosecutor had already offered plea to offense with 365-day sentence, and a plea to that offense with a 364-day sentence would have no immigration consequences]; see generally *Espinoza*, at p. 325 [the People conceded prejudice].) Defendant also asserts that the prosecution's case was weak because the victim changed her story, but this assertion is not supported by the record; the victim gave a powerful statement at defendant's sentencing condemning his conduct, which indicates continued cooperation with the prosecution. The prosecutor's report to the court that the victim was "cooperati[ve] in terms of how this case [was] being resolved" conveyed the victim's concurrence with the proposed time-served sentence rather than a lack of cooperation. Defendant more broadly asserts that the prosecution's case must have had some deep flaws or else the prosecutor would not have offered him such a "sweetheart deal," but the prosecutor explained the reasons for the deal and defendant's disbelief of those reasons is based on speculation.

Defendant did not demonstrate the probability of obtaining a more favorable outcome if he had rejected the plea and proceeded to trial. As explained above, we reject defendant's assertion that the prosecution's case was weak due to the victim's

lack of cooperation. Defendant asserts that the People did not oppose his motion to expunge his conviction under section 1203.4, but that form of relief has nothing to do with his underlying guilt. Defendant further contends that the prosecutor indicated that the case involved an "isolated incident," which in defendant's view suggests a weak case. However, this snippet was part of the prosecutor's explanation for why the People were not seeking to have defendant register as a sex offender: "And People given the circumstances, the isolated incident and lack of record and finding under *People v. Hofsheier* are not requesting or asking for [sex offender] registration." In context, the prosecutor was referring to the fact that this five-year series of sexual crimes was aimed at a specific victim who was now an adult and no longer under defendant's control; the prosecutor was not suggesting that the victim was lying except as to one incident within that five-year period. Defendant also asserts that the Sinhalese interpreter had a conflict of interest (because he had assisted both the police and the defendant during the investigation), which his attorney "could have . . . used to leverage a different but acceptable deal to both sides"; this is speculative.

The difference between the bargained-for term of imprisonment and the likely term if convicted at trial also strongly suggests that defendant accepted this plea deal despite its immigration consequences. If convicted of all charges, defendant faced a 96-year-to-life sentence; the plea deal granted him a sentence of time served. Although defendants sometimes reject a good deal in favor of a "throwing a 'Hail Mary' at trial" (*Lee*, *supra*, 582 U.S. at pp. 367-368), the stark contrast of possible outcomes here makes that highly unlikely.

In sum, the objective evidence does not corroborate defendant's self-serving assertion that he would not have entered a plea had he known of the immigration consequences of that plea. At bottom, defendant asks us to evaluate the totality of the circumstances in a manner more favorable to him, but we decline to do so in our independent review of the record.

Defendant also asks us to remand for further proceedings at which he can effectively fill in the gaps in his evidentiary showing. Although *Espinoza*, *supra*, 14 Cal.5th at p. 326, indicates that "remand for reconsideration and . . . development of the record may be advisable" in some cases, defendant has not sufficiently articulated the gaps he seeks to fill or why this case would otherwise be appropriate for remand.

## DISPOSITION

The order denying defendant's motion to vacate pursuant to Penal Code section 1473.7 is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P.J.
HOFFSTADT


We concur:


_____, J.
BAKER


_____, J.
MOOR


17